# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

## PEOPLE v MADISON

Docket No. 167120. Argued on application for leave to appeal October 9, 2025. Decided July 31, 2026.

Cinecca D. Madison, who was 19 years old when he allegedly shot two people, was charged with open murder, MCL 750.316, assault with intent to commit murder, MCL 750.83, and two counts of felony-firearm, MCL 750.227b. Defendant moved for a competency evaluation and an evaluation of his criminal responsibility in the Ottawa Circuit Court; the court entered orders referring defendant to the Center for Forensic Psychiatry, where he was evaluated by Dr. Michele Hill, who concluded that defendant was competent to stand trial. Dr. Hill noted that, while defendant had not been medicated at the time of the shooting, he had since been taking a prescribed antipsychotic administered by the jail. With regard to criminal responsibility, Dr. Hill initially was not sure whether defendant suffered from any mental illness, but she later learned that, approximately 10 months before the shooting, defendant had been the subject of mental-illness proceedings. The Ottawa Probate Court had issued a mental-health pick-up order for defendant shortly after he received treatment for paranoia and hallucinations, and Community Mental Health of Ottawa County had diagnosed defendant with schizophreniform disorder, a precursor diagnosis to schizophrenia. Nevertheless, Dr. Hill concluded that defendant was not legally insane at the time of the alleged crime. One of defendant's psychological experts opined that defendant was not legally insane at the time of the alleged crime but that defendant's mental illness affected his behavior and actions.

Defendant moved to present evidence and submit jury instructions regarding his diminished capacity, arguing that his diminished capacity negated the specific-intent element of the charged crimes. The court, Karen J. Miedema, J., denied defendant's motion on the basis that *People v Carpenter*, 464 Mich 223 (2001), held that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent. Defendant sought leave to appeal, and the Court of Appeals, REDFORD, P.J., and CAVANAGH and YATES, JJ., denied leave to appeal. Defendant sought interlocutory leave to appeal in the Supreme Court, challenging the continued viability of *Carpenter* and seeking to present evidence of his alleged diminished capacity at trial. The Supreme Court stayed the trial court proceedings and ordered and heard oral argument on the application. 515 Mich 1016 (2024).

In an opinion by Justice BERNSTEIN, joined by Chief Justice CAVANAGH and Justices WELCH, BOLDEN, THOMAS, and HOOD, the Supreme Court, in lieu of granting leave to appeal, *held*:

1. The *Carpenter* Court erred by ruling that the legal-insanity statute, MCL 768.21a, foreclosed the presentation of diminished-capacity evidence to contest the *mens rea* element of a charged specific-intent crime. The *Carpenter* Court expended little effort on interpreting the language of MCL 768.21a, which on its face addresses only the affirmative defense available to a legally insane defendant. There is no language in the statute directed at the concept of diminished capacity. A diminished-capacity argument is distinct from the insanity defense. The insanity defense is an affirmative defense that admits guilt but seeks to excuse it without reference to any individual elements of the crime. In contrast, the purpose of diminished-capacity evidence is aimed at negating specific intent; this approach does not admit the crime and seek to then excuse or justify it but instead challenges the prosecution's case by questioning whether a defendant had the requisite *mens rea* at the time of the crime. Because diminished capacity is necessarily distinct from the affirmative defense of legal insanity, the Legislature's codification of the legal-insanity defense has no bearing on the admissibility of diminished-capacity evidence. The statement in MCL 768.21a(1) that "[m]ental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity" means precisely what it says; although evidence of a defendant's diminished capacity because of mental illness or intellectual disability cannot constitute an affirmative defense of legal insanity, the statute simply does not state or imply anything about the availability of diminished-capacity evidence to negate a specific element of a crime. The *Carpenter* Court's erroneous conclusion that the Legislature had created a comprehensive statutory scheme governing *any* defense rooted in mental illness or intellectual disability was contrary to the plain language of MCL 768.21a and the statute allowing a defendant to be found guilty but mentally ill, MCL 768.36; further, it improperly used the Legislature's silence on the use of evidence of diminished capacity outside of legal insanity to overturn decades of common law.

2. Principles of stare decisis weigh in favor of overruling *Carpenter*. Whether a case was wrongly decided is not, in itself, determinative of whether it should be overruled. In determining whether the decision should be overruled, a court reviews whether the decision defies practical workability, whether reliance interests would work an undue hardship were the decision to be overruled, and whether changes in the law or facts no longer justify the decision. The court may also consider whether the prior decision was an abrupt and largely unexplained departure from precedent and whether upholding the rule is likely to result in serious detriment prejudicial to public interests. Regarding practical workability, while *Carpenter*'s all-or-nothing approach is straightforward to apply, this factor is of little weight in comparison to the import of safeguarding the ability of criminal defendants to present a defense that should be available and that was otherwise available for at least 30 years before *Carpenter*. Next, reliance interests do not weigh in favor of retaining *Carpenter*. Overruling *Carpenter* will lead to a change in evidence that some defendants seek to raise in the context of their own individual trials, but this will not create a dislocation of the trial process. Fact-finders and trial court judges are well equipped to adjust to the renewed availability of the diminished-capacity defense, and evidentiary rules will guide the admission of mental-health evidence in this context as they would in any other. The most serious concern regarding reliance interests is how overruling *Carpenter* will impact court operations in

the aggregate, but even if this reliance factor weighs in favor of maintaining *Carpenter*, it is not, in itself, dispositive. Finally, while it is difficult to say whether there were changes in the law or facts since *Carpenter*, *Carpenter*'s all-or-nothing approach has increasingly appeared inconsistent with the state of the medical and psychiatric fields as the scientific understanding of mental health and intellectual disability has evolved. Although overruling *Carpenter* might require the justice system to adjust or adopt new procedures, the other factors weigh in favor of overruling *Carpenter*.

Trial court's order vacated; case remanded to the trial court for further proceedings.

Chief Justice CAVANAGH, joined by Justice WELCH, concurring, fully agreed with the majority but wrote separately to comment on the broader impact of the decision and to provide further explanation as to how trial courts should examine diminished-capacity evidence moving forward. Chief Justice CAVANAGH questioned whether *People v Mangiapane*, 85 Mich App 379 (1978), and other decisions like it remain good law. Moreover, she wrote to caution that the majority opinion's decision should not be interpreted as a free-for-all in regard to the introduction of evidence of mental illness or intellectual disability; all pertinent rules of evidence, including MRE 401, MRE 403, and MRE 701, continue to apply.

Justice WELCH, concurring, fully agreed with the majority opinion, and she also agreed with Justice HOOD that lower courts will face postconviction motions from defendants seeking to apply the majority's decision retroactively; accordingly, she wrote to highlight helpful aspects of state and federal retroactivity jurisprudence and to point courts toward pertinent caselaw discussing the process for determining retroactivity.

Justice HOOD, concurring, agreed with the majority opinion but was cautious in reaching the decision to overturn *Carpenter* because of his grave concerns about the ripple effects that overturning *Carpenter* will have on every level of Michigan's court system. The focus of his disagreement with the majority's stare decisis analysis relates to whether overturning *Carpenter* would work an undue hardship because of reliance on that case. Overturning *Carpenter* may have impacts on legislative and administrative frameworks that have developed around not-guilty-by-reason-of-insanity adjudications and on the judicial system's ability to efficiently manage criminal proceedings, particularly with regard to requests or referrals for diminished-capacity evaluations. The Center for Forensic Psychiatry is already overwhelmed and backlogged, and the current demand of competency and criminal-responsibility referrals already impacts the timeliness of cases; the majority's decision adds—and potentially substantially adds—to them. Additionally, overturning *Carpenter* will likely dramatically increase postconviction motions and appeals that will necessarily seek to define the scope of the majority's decision. Justice HOOD supports administrative review of the Michigan Court Rules to assist courts in addressing the challenges that the majority's decision will pose, and he encourages the Legislature to monitor this issue.

Justice ZAHRA, dissenting, would have upheld *Carpenter* because it was faithful to the applicable statutory scheme and rightly decided. The majority's decision to overrule *Carpenter* plainly controverts the clear intent of the Legislature by undermining the comprehensive statutory scheme set forth by the Legislature, and its revival of the diminished-capacity defense conflicts with multiple provisions of the statute. Specifically, permitting the diminished-capacity defense allows intellectually disabled defendants to circumvent the Legislature's policy choice that

intellectually disabled criminals receive some form of state-enforced psychiatric attention. The majority opinion substitutes its own results-driven interpretation of the statute, ignoring obvious indications of statutory intent. The majority opinion also relies on inapposite caselaw and the arguments of criminal defendants to erroneously conclude that *Carpenter* has been widely criticized. Furthermore, the majority opinion's holding raises new and thorny questions that courts and litigants will have to face, including the applicable notice and evidentiary requirements and which party bears the burden of proof.

Further, the majority ignores the dictates of stare decisis. The majority improperly decides that the practical-workability factor is of little weight, and the majority improperly asserts that it is the duty of the Supreme Court to safeguard defenses that should be available to defendants. The United States Supreme Court has repeatedly held that criminal defendants do not have a due-process right to present a diminished-capacity defense, and whether defendants *ought* to be able to assert the diminished-capacity defense is a question for the Legislature. Regarding reliance interests, the majority's decision reshapes strategy incentives for criminal defendants and creates significant procedural and evidentiary questions. Additionally, the majority opinion's attack on *Carpenter*'s reasonableness in light of unchanged facts is irrelevant to a proper stare decisis analysis and more properly constitutes a merits-based argument against *Carpenter*. Regarding whether upholding the rule is likely to result in serious detriment prejudicial to public interests, criminal defendants do not have a constitutional right to present diminished-capacity evidence to negate the element of *mens rea*, so there is no public interest at stake. *Carpenter* was not an abrupt departure from precedent; even on collateral review, the Supreme Court of the United States in *Metrish v Lancaster*, 569 US 351, 368 (2013), unanimously accepted the *Carpenter* Court's "reasonable interpretation of the language of a controlling statute," i.e., MCL 768.21a, as barring evidence of mental illness on criminal culpability unless presented under the defense of legal insanity. Justice ZAHRA would conclude that *Carpenter* should be retained.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 31, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                    No. 167120

CINECCA DAQUAN MADISON,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

BERNSTEIN, J.

Since this Court decided *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), its holding that nothing short of legal insanity—including evidence of mental incapacity less than legal insanity to negate the *mens rea* requirement of specific-intent crimes—can be used to avoid or reduce criminal responsibility has been subject to questions and criticism. Today, we conclude that *Carpenter* was wrongly decided and that the principles of stare decisis weigh in favor of overruling it. We therefore overturn *Carpenter* and

remand this case to the trial court for further proceedings not inconsistent with this decision.

## I. FACTUAL AND PROCEDURAL HISTORY

In June 2022, defendant, then 19 years old, was riding his bike with Antory Burrell and Demontae Knight. While the three were riding through a park, defendant allegedly shot his two companions. Burrell sustained four gunshot wounds and Knight sustained five. Defendant was uninjured and fled the scene. Burrell and Knight were taken to the hospital, where Burrell died of his injuries. Knight survived, but he underwent four surgeries and was hospitalized for 10 days. According to Knight, defendant shot both men from behind, and while Knight was "playing dead" after being shot, he saw defendant walk up to Burrell as he lay motionless on the ground and shoot him again. Defendant was charged with open murder in violation of MCL 750.316, assault with intent to commit murder in violation of MCL 750.83, and two counts of carrying or possessing a firearm when committing or attempting to commit a felony in violation of MCL 750.227b.

In the trial court, defendant moved for a competency evaluation and an evaluation of his criminal responsibility. The court entered orders referring defendant to the Center for Forensic Psychiatry, where he was evaluated by Dr. Michele Hill, who concluded that defendant was competent to stand trial. Dr. Hill noted that, while defendant had not been medicated at the time of the shooting, he had since been taking a prescribed antipsychotic administered by the jail. With regard to criminal responsibility, Dr. Hill initially was not sure whether defendant suffered from any mental illness, but she later learned that, approximately 10 months before the shooting, defendant had been the subject of mental-

2

illness proceedings in Ottawa County. The Ottawa Probate Court had issued a mental-health pick-up order for defendant shortly after he received treatment for paranoia and hallucinations at Holland Hospital. Although defendant presented as agitated, psychotic, and disorganized, he was initially denied follow-up treatment due to uncertainty over whether his symptoms were caused by a history of drug use. After several months of clean urine screens, Community Mental Health of Ottawa County diagnosed defendant with schizophreniform disorder—the precursor diagnosis to schizophrenia.[1] Accordingly, Dr. Hill opined that defendant "was experiencing a substantial disorder of thought that at times significantly impaired his capacity to recognize reality during the months leading up to the alleged offense and was mentally ill." Nevertheless, she continued to conclude that defendant was not legally insane at the time the alleged crime took place.

Defendant retained psychological experts of his own. Defense expert Dr. Jeffery Kieliszewski agreed with Dr. Hill that defendant was not legally insane at the time the shooting occurred but opined that defendant's mental illness affected his behavior and actions. Defense expert Dr. Michael Wolff did not directly opine on defendant's criminal responsibility but indicated that defendant's mental illness and intellectual disability affected his perception of the events surrounding his alleged criminal activity.

Defendant thereafter moved to present evidence and submit jury instructions regarding his diminished capacity, arguing that his diminished capacity negated the specific-intent element of the charged crimes. The trial court denied defendant's motion.

---

[1] Defendant asserts that this diagnosis was based on, among other things, his statements that the television was whispering evil things to him, that his teddy bear was shooting him funny looks, and that he felt like another person was scratching at the walls of his home to get to him.

It recognized that this Court in *Carpenter*, 464 Mich at 237, held that "the Legislature has created an all or nothing insanity defense" and, therefore, "evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent." Accordingly, the trial court concluded, "[b]ecause defendant does not meet the definition of legal insanity, he is prohibited from presenting evidence of his mental illness to negate the specific intent elements of the charged crimes or reduce his criminal responsibility." The trial court further granted defendant's motion to present a theory of self-defense and added that, because defendant's primary intended defense theory was self-defense, it was "premature to determine whether other evidence will support an instruction for voluntary manslaughter."

Defendant sought to challenge this determination on an emergency basis in the Court of Appeals. The Court of Appeals granted immediate consideration but denied leave to appeal for failure to persuade the Court of the need for interlocutory review. *People v Madison*, unpublished order of the Court of Appeals, entered May 10, 2024 (Docket No. 369559). Defendant next sought interlocutory leave to appeal in this Court, challenging the continued viability of *Carpenter* and seeking to present evidence of his alleged diminished capacity at trial. This Court stayed the trial court proceedings and ordered oral argument on the application. *People v Madison*, 515 Mich 1016 (2024).

## II. STANDARD OF REVIEW

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). We review de

4

novo questions of law, including whether a statute precludes the admission of any particular evidence. *Denson*, 500 Mich at 396.

We review de novo questions of statutory interpretation. *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 137; 881 NW2d 95 (2016). Our primary goal in statutory interpretation is to ascertain the Legislature's intent, the foremost indicator of which is the statutory language. *ACLU of Mich v Calhoun Co Sheriff's Office*, 509 Mich 1, 8; 983 NW2d 300 (2022). "Therefore, we start by examining the words of the statute, which 'should be interpreted on the basis of their ordinary meaning and the context within which they are used in the statute.' " *People v Harris*, 499 Mich 332, 345; 885 NW2d 832 (2016), quoting *People v Zajaczkowski*, 493 Mich 6, 13; 825 NW2d 554 (2012).

### III.  LEGAL BACKGROUND

### A.  THE INSANITY DEFENSE AND DIMINISHED CAPACITY

At least as far back as *Roberts v People*, 19 Mich 401, 421-423 (1870), this Court has observed that insanity may have some bearing on whether a person may be capable of forming the intent necessary to be held culpable for a crime. In *People v Durfee*, 62 Mich 487, 494; 29 NW 109 (1886), this Court set forth the common-law understanding of legal insanity, which the circuit court in that case described as follows:

> "You have heard the evidence in the case, you know what the circumstances are, and you can judge from all the evidence in the case— including the transaction itself, and his conduct at the time—whether or not he exhibited evidences which leave a reasonable doubt in your minds of the soundness of his mind in that transaction.  Did he know what he was doing,— whether it was right or wrong?  and if he did, then did he know or did he have the power, the will power, to resist the impulse occasioned?  You are not to draw the inference because a man acts frantically mad and angry, very angry, that he does not resist the impulse,—that that is unsoundness of mind.

[This unsoundness must be the result of a disease, and not the result of his having allowed his passions to run until they have become uncontrollable. We frequently meet men in courts of justice who claim that they have committed a crime because they were drunk. The law holds them responsible, because they should not have got drunk; they should not have formed the habit. So the law requires of a man that he will curb his passions and restrain himself, and, if he does not do it, holds him accountable, unless it is by reason of disease which renders him unable to do it.]" [Brackets in original.]

This Court identified the salient points of the *Durfee* test as "1) whether defendant knew what he was doing was right or wrong; and 2) if he did, did he have the power, the will power, to resist doing the wrongful act?" *People v Martin*, 386 Mich 407, 418; 192 NW2d 215 (1971). The Legislature created a notice requirement for the insanity defense in 1927 but did not define insanity. 1927 PA 175.

In *People v Lynch*, 47 Mich App 8, 15; 208 NW2d 656 (1973), the Court of Appeals considered whether a defendant who did not raise an insanity defense should have been permitted to offer expert testimony regarding her "mentality and state of mind as bearing upon her intent" in her trial for the murder of her newborn daughter. Considering whether such evidence would subvert the insanity-defense standard set forth in *Durfee*, the *Lynch* Court reasoned:

There are some states that . . . hold[] that mental capacity is an all or nothing matter and that only insanity, by whatever definition thereof might prevail therein, negates criminal intent. The majority, and we think the sounder, view, however, permits such medical proof, sometimes called proof of diminished or partial responsibility, as bearing on intent generally or at least on those special states of mind where a specific intent is required or where the state of mind by definition determines the degree of the offense as here. [*Id*. at 20.]

The *Lynch* Court therefore found "nothing novel in admitting testimony bearing on intent" and observed that developments in behavioral science did not change the rules surrounding

6

admission of evidence. *Id*. at 21. "It must be borne in mind that insanity as a defense is one thing and that proof of the existence or nonexistence of the specific essential mental state, disjoined from any question of legal sanity, is quite another thing." *Id*. (quotation marks and citation omitted).

The *Lynch* Court conceived of diminished capacity as an evidentiary issue. The proposed testimony of the defendant's mental-health experts was deemed "material and relevant" to the question of specific intent, so the Court of Appeals held that the trial court erred in precluding the admission of the evidence. *Id*. at 22. In contrast to insanity, diminished capacity was not considered an affirmative defense because "the question is simply whether there shall be excluded evidence which merely denies the existence of facts which the State must prove to establish that the murder was in the first degree." *Id*. at 19 (quotation marks and citation omitted). Diminished capacity was not explicitly defined in the opinion but was referred to as a "mental condition less than insanity . . . ." *Id*. The *Lynch* Court further recognized that a defendant who successfully put forth evidence of diminished capacity could still be found guilty of a crime that lacked a specific-intent requirement. *Id*. at 20-22. In contrast, the insanity defense was understood as an affirmative defense to all offenses. *People v Finley*, 38 Mich 482, 483-485 (1878). And while the insanity defense required notice to the prosecution, defendants were not required to provide notice to the prosecution before presenting evidence of diminished capacity. *Lynch*, 47 Mich App at 20.

Shortly after *Lynch* was decided, the Legislature enacted the Mental Health Code, MCL 330.1001 *et seq*. See 1974 PA 258, effective August 6, 1975. Alongside this

7

legislation, the Legislature also enacted 1975 PA 180, which codified the insanity defense at MCL 768.21a.  MCL 768.21a, as originally enacted by 1975 PA 180, provided:

> (1) A person is legally insane if, as a result of mental illness as defined in [MCL 330.1400a], or as a result of mental retardation as defined in section [MCL 330.1500(g)] of the Michigan Compiled Laws, that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

> (2) A person who is under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his alleged offense shall not thereby be deemed to have been legally insane.

As amended by 1994 PA 56 and 2014 PA 76,[2] MCL 768.21a currently provides:

> (1) It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense.  An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400, or as a result of having an intellectual disability as defined in section 100b of the mental health code, 1974 PA 258, MCL 330.1100b, that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law.  Mental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity.

> (2) An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances.

> (3) The defendant has the burden of proving the defense of insanity by a preponderance of the evidence.

---

[2] The 2014 amendments to the statute did not substantively alter MCL 768.21a from the version that existed at the time *Carpenter* was decided.  These amendments included stylistic edits and inserted the term "intellectual disability" in place of outdated language.

As recognized by the statute, the insanity defense is an affirmative defense. "An affirmative defense admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime." *People v Dupree*, 486 Mich 693, 704 n 11; 788 NW2d 399 (2010).

Also in 1975 PA 180, the Legislature adopted MCL 768.36, allowing a defendant who asserts an insanity defense to be found "guilty but mentally ill" (GBMI). MCL 768.36(1) currently provides:

> (1) If the defendant asserts a defense of insanity in compliance with section 20a of this chapter, the defendant may be found [GBMI] if, after trial, the trier of fact finds all of the following:
>
> (a) The defendant is guilty beyond a reasonable doubt of an offense.
>
> (b) The defendant has proven by a preponderance of the evidence that he or she was mentally ill at the time of the commission of that offense.
>
> (c) The defendant has not established by a preponderance of the evidence that he or she lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law.

Neither the insanity-defense statute nor the GBMI statute mentions diminished capacity.

In the wake of the codification of the insanity defense, the Court of Appeals continued to allow defendants to raise the diminished-capacity defense but procedurally treated diminished capacity as a subset of legal insanity. See *People v Mangiapane*, 85 Mich App 379, 395; 271 NW2d 240 (1978) ("We find that the defense known as diminished capacity comes within this codified definition of legal insanity. We further find that psychiatric testimony on the issue of defendant's capacity to form the specific intent comes within the codified definition of legal insanity. By thus categorizing

9

defendant's defense we do not preclude the admission of evidence supporting defendant's claim that, although not legally insane, he lacks mental capacity to entertain the specific intent that is a necessary element of assault with intent to commit murder. But, we hold that defendant must give the notice required by the statute of intention to assert that defense."); *People v Denton*, 138 Mich App 568, 570-572; 360 NW2d 245 (1984) (citing *Mangiapane* and applying the procedural requirements to assert legal insanity to a diminished-capacity defense); *People v Anderson*, 166 Mich App 455, 464; 421 NW2d 200 (1988) ("There is no statutory definition of diminished capacity. Rather, diminished capacity is part of the law of insanity."); see also *People v Hall*, 83 Mich App 632, 638-639; 269 NW2d 476 (1978) (concluding that the jury was properly permitted to consider testimony on diminished capacity negating specific intent, even though the instruction was not specifically labeled "diminished capacity").

We do not intend to suggest that this line of caselaw is without fault. As the Court of Appeals created procedural rules for diminished capacity, it also conflated key terminology in mental health and mental health law.[3] This Court, which did not directly

---

[3] For example, the *Mangiapane* panel opined that the statutory definition of what is now referred to as intellectual disability had "striking similarities" to diminished capacity and that in many cases a person claiming diminished capacity would fall within the definition of intellectual disability. *Mangiapane*, 85 Mich App at 392. But despite this conclusion, the *Mangiapane* Court nevertheless continued to allow admission of evidence showing a lack of "mental capacity to entertain the specific intent that is a necessary element of assault with intent to commit murder." *Id*. at 395.

In *People v Linzey*, 112 Mich App 374, 378-379; 315 NW2d 550 (1981), the Court of Appeals seemed to substitute the concept of diminished capacity for the "lacks substantial capacity" language in the insanity statute, MCL 768.21a(1), when it stated, "It does not follow that being mentally ill as defined by the Mental Health Code necessarily means that the person has diminished capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." See also *People v Smith*,

10

address the validity of the diminished-capacity defense until *Carpenter*, failed to clarify that diminished capacity and insanity are distinct legal concepts even as we implicitly recognized that defendants could still introduce evidence of diminished capacity in addition to presenting the affirmative defense of insanity. See, e.g., *People v Griffin*, 433 Mich 860 (1989) (ordering a hearing on an ineffective-assistance-of-counsel claim for failure to explore defenses of diminished capacity and insanity).[4]

## B. *PEOPLE v CARPENTER*

In *Carpenter*, this Court initially granted leave "to consider whether the lower courts properly determined that it was defendant's burden to establish his diminished capacity defense by a preponderance of the evidence under MCL 768.21a." *Carpenter*, 464 Mich at 225-226. Despite this framing, this Court ultimately departed from that inquiry and instead held that,

> by enacting a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation,[5] the Legislature has signified its intent not to allow a defendant to introduce evidence of mental abnormalities short of legal

---

119 Mich App 91, 95; 326 NW2d 434 (1982) (stating that "insanity and mental illness are separate defenses with different consequences").

[4] We note that the dissent, too, echoes some of this confusion in terminology by implying that diminished capacity applies only to defendants who are intellectually disabled, without recognizing that defendants with mental illness but not intellectual disability may present evidence of diminished capacity.

[5] Although this phrasing was used in the version of MCL 768.21a that existed at the time *Carpenter* was decided, as explained in note 2 of this opinion, this outdated language has since been replaced in this provision and elsewhere with "intellectual disability." See 2014 PA 76.

11

insanity to avoid or reduce criminal responsibility by negating specific intent. [*Id*. at 226.]

The *Carpenter* Court, noting that the diminished-capacity defense had "been the subject of much debate" throughout the country, *id*. at 236, observed that one common criticism had been the difficulty of applying "the subtle gradations" of mental-health diagnoses to the question of criminal responsibility, *id*. at 236-237. However, the *Carpenter* Court concluded that our Legislature had sidestepped this confusion by enacting "an all or nothing insanity defense." *Id*. at 237. In explaining this conclusion, the Court stated:

> Central to our holding is the fact that the Legislature has already contemplated and addressed situations involving persons who are mentally ill or retarded yet not legally insane. As noted above, such a person may be found "guilty but mentally ill" and must be sentenced in the same manner as any other defendant committing the same offense and subject to psychiatric evaluation and treatment. MCL 768.36(3). Through this statutory provision, the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent.
>
> As a final matter, we note that even persons *acquitted* of an offense by reason of insanity may be confined and required to undergo evaluation and treatment. MCL 330.2050. . . .
>
> * * *
>
> . . . Accordingly, we hold that the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. [*Id*. at 237-239.]

Justice MARILYN J. KELLY authored a dissent in *Carpenter*, finding no language in either the insanity statute or the GBMI statute that addressed the use of evidence to negate specific intent. *Id*. at 251 (KELLY, J., dissenting). Justice KELLY observed that, instead, "both statutes concern affirmative defenses available to a legally insane defendant. These

two statutes, by their plain language, apply only if a defendant seeks to introduce evidence of a mental illness to justify or excuse an otherwise criminal act." *Id*. The dissent further highlighted that the "Legislature has made it clear that a person may not be punished for a crime if the prosecution is unable to prove the necessary mens rea." *Id*. at 252. The dissent thus opined that the rule created by the *Carpenter* majority violated a defendant's due-process right to present a defense, without justification in the relevant statutory language. *Id*. at 254.

In line with the reasoning of the *Carpenter* dissent, criminal defendants have repeatedly questioned the validity of *Carpenter*'s holding. See, e.g., *People v Marzejka*, unpublished per curiam opinion of the Court of Appeals, issued September 16, 2021 (Docket No. 352694), p 7 (the defendant argued an ineffective-assistance-of-counsel claim where counsel declined to present testimony that the defendant's mental illness and failure to take medications for mental-health conditions precluded his ability to act with premeditation); *People v Casteel*, unpublished per curiam opinion of the Court of Appeals, issued September 15, 2015 (Docket No. 321340), pp 3-4 (the defendant unsuccessfully sought to admit evidence of mental illness, which appeared to manifest as a series of paranoid delusions, to negate the specific intent to commit terrorism).

Courts, too, have questioned the basis for the *Carpenter* decision. See *Lancaster v Metrish*, 683 F3d 740, 752 (CA 6, 2012) (concluding that, in light of the consistent line of precedential caselaw recognizing the diminished-capacity defense and the recognition of the defense in Michigan's standard criminal jury instructions, "the 2001 judicial elimination of the diminished-capacity defense here was . . . unforeseeable" for purposes

13

of retroactive application), rev'd 569 US 351 (2013).[6]  Recently, the question of whether

*Carpenter* was wrongly decided was raised in *People v Tyson*, 509 Mich 1049 (2022).

Although a split Court ultimately denied leave, *People v Tyson*, 511 Mich 1080 (2023), a

majority of the justices then on the Court indicated a belief that *Carpenter* was wrongly

decided.[7]

## IV. ANALYSIS

### A. WHETHER *CARPENTER* WAS WRONGLY DECIDED

The *Carpenter* Court's legal analysis turns the canons of statutory interpretation on

their head.  The opinion makes several interesting decisions, the first of which was to opine

---

[6] *Lancaster* specifically considered whether the trial court's retroactive application of the *Carpenter* rule, i.e., disallowing the defendant from presenting a diminished-capacity defense, violated the defendant's due-process rights.  In concluding that retroactive application was not an " 'unreasonable application of . . . clearly established [f]ederal law,' " the United States Supreme Court called *Carpenter* a "reasonable interpretation of the language of a controlling statute." *Metrish v Lancaster*, 569 US 351, 365, 368; 133 S Ct 1781; 185 L Ed 2d 988 (2013), quoting 28 USC 2254(d)(1).  As the "unreasonable application" standard is an extremely difficult hurdle to overcome, see *Shinn v Kayer*, 592 US 111, 118; 141 S Ct 517; 208 L Ed 2d 353 (2020) (explaining that "[t]o meet that standard, a prisoner must show far more than that the state court's decision was 'merely wrong' or 'even clear error' ") (citation omitted), this is hardly the stamp of approval that the dissenting justice seems to suggest that we "conveniently omit[]."

[7] Both the concurring statement authored by Chief Justice CLEMENT and the dissenting statement authored by Justice CAVANAGH, joined by Justices WELCH and BOLDEN, concluded that *Carpenter* had been wrongly decided. *Id.* at 1080 (CLEMENT, C.J., concurring); *id.* at 1081 (M. K. CAVANAGH, J., dissenting).  As Justice ZAHRA notes in his dissent here, Chief Justice CLEMENT questioned whether this Court or the Legislature was the correct body to correct *Carpenter*'s error. *Id.* at 1081 (CLEMENT, C.J., concurring).  But, where the Legislature has already delineated which crimes include a specific-intent element and yet criminal defendants are being convicted of those offenses when they do not have the capacity to form specific intent, we respectfully conclude that we have the power to reverse *Carpenter*'s error.

on an issue first raised in briefing to this Court after leave was granted, but it is this Court's failure to properly focus on the language of MCL 768.21a that is the most concerning.

Again, in matters of statutory interpretation, this Court's first resort is to the words of the statute itself, and "[o]ur role as members of the judiciary is not to second-guess [the Legislature's] policy decisions or to change the words of a statute in order to reach a different result." *Harris*, 499 Mich at 345. "Courts may not speculate regarding legislative intent beyond the words expressed in a statute." *Mich Ed Ass'n v Secretary of State (On Rehearing)*, 489 Mich 194, 217-218; 801 NW2d 35 (2011) (quotation marks and citation omitted).

The *Carpenter* Court expended little effort on interpreting the language of MCL 768.21a, which on its face addresses only the affirmative defense available to a legally insane defendant. There is no language in the statute directed at the concept of diminished capacity. Nor does such language exist in the GBMI statute, MCL 768.36, which the *Carpenter* Court used to buttress its decision. Indeed, the GBMI statute is, by its own plain language, applicable only to a defendant asserting an insanity defense. MCL 768.36(1). Both of these statutes, then, "apply only if a defendant seeks to introduce evidence of a mental illness to justify or excuse an otherwise criminal act." *Carpenter*, 464 Mich at 251 (KELLY, J., dissenting).

A diminished-capacity argument is distinct from the insanity defense. The insanity defense is an affirmative defense that admits guilt but seeks to excuse it without reference to any individual elements of the crime. See *Dupree*, 486 Mich at 704 n 11. In contrast, the purpose of diminished-capacity evidence is aimed at negating specific intent. This approach does not admit the crime and seek to then excuse or justify it; instead, it

15

challenges the prosecution's case by questioning whether a defendant had the requisite *mens rea* at the time of the crime.[8]

Because diminished capacity is necessarily distinct from the affirmative defense of legal insanity, the Legislature's codification of the legal-insanity defense has no bearing on the admissibility of diminished-capacity evidence. The statement in MCL 768.21a(1) that "[m]ental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity" means precisely what it says; although evidence of a defendant's diminished capacity because of mental illness or intellectual disability cannot constitute an affirmative defense of legal insanity, the statute simply does not state or imply anything about the availability of diminished-capacity evidence to negate a specific element of a crime. Accordingly, the *Carpenter* Court erroneously drew conclusions that were not supported by the statutory language of MCL 768.21a.

---

[8] For that reason, some federal courts have reasoned that diminished-capacity evidence is properly understood as "not a defense at all but merely a rule of evidence." See *United States v Pohlot*, 827 F2d 889, 897 (CA 3, 1987). Alternatively, some state courts have described diminished capacity as a "partial defense" because it only counters specific-intent crimes. Defendants who prevail in raising diminished capacity may still be found guilty of offenses without a specific-intent *mens rea* requirement. See, e.g., *State v McKenzie*, 186 Mont 481, 524; 608 P2d 428 (1980) (stating that the defense of insanity was not necessarily identical with the diminished-capacity defense because while insanity involved complete exoneration, diminished capacity included the possibility that a jury might convict a defendant of the lesser included offense of aggravated assault rather than criminal homicide), overruled in part on other grounds by *State v Van Kirk*, 306 Mont 215, 226 (2001); *Commonwealth v Johnson*, 630 Pa 493, 567; 107 A3d 52 (2014) ("[F]or a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder.") (quotation marks and citation omitted). Raising diminished capacity may even be a concession of general criminal liability. See, e.g., *Commonwealth v Walzack*, 468 Pa 210, 221; 360 A2d 914 (1976). Conversely, insanity is a complete defense to all charged crimes.

16

Contrary to the assumptions of the *Carpenter* Court, permitting evidence of diminished capacity does not render superfluous any aspect of the statutory insanity defense or the GBMI provision. Again, the introduction of evidence of diminished capacity is fundamentally distinct from the affirmative defense of legal insanity that is set forth in these provisions. Therefore, the *Carpenter* Court's erroneous conclusion that the Legislature had created a "comprehensive statutory scheme" governing *any* defense rooted in mental illness or intellectual disability, *Carpenter*, 464 Mich at 241, was not just contrary to the plain language of these statutes; it also improperly used the Legislature's silence on the use of evidence of diminished capacity outside of legal insanity to overturn decades of common law dating from *Lynch*, 47 Mich App 8. See *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006) (explaining that when the Legislature intends to abrogate the common law, "it should speak in no uncertain terms").

## B. STARE DECISIS

Having concluded that *Carpenter* was wrongly decided, the next question is whether it ought to be retained under the principles of stare decisis. Whether a case was wrongly decided is not, in itself, determinative of whether it should be overruled. *Coldwater v Consumers Energy Co*, 500 Mich 158, 172; 895 NW2d 154 (2017). As has long been understood, "to 'avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them[.]' " *Id*., quoting The Federalist No. 78 (Hamilton) (Rossiter ed, 1961), p 471 (brackets in *Coldwater*). This does not mean, however, that stare decisis is "to be applied mechanically to forever prevent the Court from

17

overruling earlier erroneous decisions determining the meaning of statutes." *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), citing *Holder v Hall*, 512 US 874, 944; 114 S Ct 2581; 129 L Ed 2d 687 (1994). To the contrary, we must "recognize that stare decisis is a 'principle of policy' rather than 'an inexorable command,' and that the Court is not constrained to follow precedent when governing decisions are unworkable or are badly reasoned." *Robinson*, 462 Mich at 464 (citations omitted). To that end, we "review whether the decision defies practical workability, whether reliance interests would work an undue hardship were the decision to be overruled, and whether changes in the law or facts no longer justify the decision." *Coldwater*, 500 Mich at 173, citing *Robinson*, 462 Mich at 464. We may also consider "whether the prior decision was an abrupt and largely unexplained departure from precedent" and "whether upholding the rule is likely to result in serious detriment prejudicial to public interests." *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 369; 792 NW2d 686 (2010) (quotation marks and citation omitted); see also *Univ of Mich Regents v Titan Ins Co*, 487 Mich 289, 303-304; 791 NW2d 897 (2010), overruled in part on other grounds by *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 222 (2012).

We turn first to whether *Carpenter* defies practical workability. From a perspective of pure functionality, *Carpenter*'s all-or-nothing approach is straightforward to apply. However, we find this factor to be of little weight in comparison to the import of safeguarding the ability of criminal defendants to present a defense that should be available and that was otherwise available for at least 30 years before the wayward *Carpenter* decision. That is, while *Carpenter*'s prohibition against diminished-capacity evidence is certainly workable, we believe that convenience is a poor reason to continue to prohibit a

18

defense—one that was long available at common law—on the basis of a flawed statutory analysis.[9]

Next, we consider whether reliance interests weigh in favor of retaining *Carpenter*. We conclude that they do not. In considering the weight of existing reliance interests, "the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Robinson*, 462 Mich at 466. Overruling *Carpenter* will lead to a change in evidence that some defendants seek to raise in the context of their own individual trials, but this will not create a "dislocation" of the trial process. Both before and after *Carpenter*, prosecutors have had a fundamental duty to prove each element of a charged crime beyond a reasonable doubt, and no aspect of this opinion alters that burden. Criminal defendants who would have presented a diminished-capacity defense but for *Carpenter* of course complied with its rule, but the fact that defendants conformed their behavior to *Carpenter*'s rule in past trials does not equate with reliance on that rule.[10] In fact, criminal defendants have long argued that the *Carpenter*

_____

[9] Justice ZAHRA reasonably notes that our caselaw does not authorize a reviewing court to ignore stare decisis factors by "emphasizing the high stakes in the case." But that is not what we do here. Rather, we recognize that the "practical workability" factor considers more than mere ease of application. See, e.g., *Paige v Sterling Hts*, 476 Mich 495, 511; 720 NW2d 219 (2006) ("[W]e do believe that there is a 'practical workability' problem, not in the sense that a court of law cannot render some decision—no opinion of this Court is 'unworkable' in that sense—but in the sense that the law is made a mockery . . . ."). When considering whether a previous decision defies practical workability, we must consider the goal the decision is working toward. In the context of a criminal trial, the goal is not merely efficiency but the full protection of a criminal defendant's legal rights.

[10] We acknowledge that *Carpenter* has prohibited innumerable defendants in Michigan from presenting a diminished-capacity defense for 25 years. But the weight of this past practice is more relevant to the question of whether this Court's decision to overrule

19

rule impedes their ability to present a defense. See, e.g., *Tyson*, 511 Mich 1080; *Marzejka*, unpub op at 7; *Casteel*, unpub op at 3-4.

Although the prosecution has argued that overturning *Carpenter* would revive difficulties that previously accompanied administration of the diminished-capacity defense, fact-finders and trial court judges are well equipped to adjust to the renewed availability of the diminished-capacity defense. Fact-finders are already tasked with assessing the import of mental-health evidence in other contexts, as recognized in *People v Yost*, 278 Mich App 341, 357-358; 749 NW2d 753 (2008) (holding that jurors could assess evidence of the defendant's intellectual disability to consider whether the defendant had a guilty conscience). Evidentiary rules, such as those requiring that evidence be material and reliable, see MRE 401 and MRE 402, will guide the admission of mental-health evidence in this context just as they would in any other.

The most serious concern regarding reliance interests on *Carpenter* is how overruling that decision will impact court operations in the aggregate. It is possible that, as Justice HOOD notes, referrals for psychiatric evaluations could delay trials and tax an already congested system. But we cannot be certain of the impacts of our decision before they occur, and even if this reliance factor weighs in favor of maintaining *Carpenter* under principles of stare decisis, it is not, in itself, dispositive.

---

*Carpenter* should be retroactive. See *People v Barnes*, 502 Mich 265, 268; 917 NW2d 577 (2018) (explaining that, as a general rule, "judicial decisions which express new rules normally are not applied retroactively to other cases that have become final"); *People v Robinson*, ___ Mich ___, ___; ___ NW3d ___ (February 4, 2026) (Docket No. 167595); slip op at 8-11 (explaining the exceptions to the general rule against retroactive application of new rules). Whether our decision in the instant case will be subject to retroactive application is not a question that we address today.

Finally, we ask whether changes in the law or facts no longer justify the *Carpenter* decision. It is difficult to say that there have been changes in the law or facts since *Carpenter* was decided. If anything, the *Carpenter* Court intentionally overlooked the already recognized "subtle gradations of mental illness recognized in the psychiatric field," *Carpenter*, 464 Mich at 236 (opinion of the Court), in favor of the simplest rule it could construct. However, *Carpenter*'s all-or-nothing approach has increasingly appeared inconsistent with the state of the medical and psychiatric fields as the scientific understanding of mental health and intellectual disability has evolved. As amici curiae the American Psychological Association, the Michigan Psychological Association, and the National Association of Social Workers and its Michigan chapter noted:

> This framing of mental-health disorders as a series of diagnostic points along a gradient stretching from sanity to insanity does not reflect the modern scientific understanding about the nature of mental illness. By studying the symptoms of mental illness, their occurrence across a variety of disorders, and the cognitive and behavioral functions that they may impair, scientists have come to recognize that individuals can exhibit symptoms of multiple, seemingly unrelated disorders simultaneously, and that symptoms of a particular disorder can manifest differently in different people. . . .
>
> These insights, and the supporting research described throughout this brief, show that there is strong scientific evidence supporting the introduction of probative evidence related to mental illness short of the extremely high threshold of legal insanity. [Brief for American Psychological Association, Michigan Psychological Association, and National Association of Social Workers as Amici Curiae (March 12, 2025) (Docket No. 167120) at 5.]

Indeed, Chief Justice CAVANAGH recently noted in her *Tyson* dissenting statement that the Michigan court system has recognized these evolved understandings in the form of mental-health-court programs. *Tyson*, 511 Mich at 1090 (M. K. CAVANAGH, J., dissenting). The fact that this type of scientific evidence is not available to defendants as a matter of course

21

under *Carpenter* renders our approach to mental-health-based defenses out of step with the scientific community and, arguably, other corners of our own state justice system.

Contrary to the implication of Justice ZAHRA's dissent, our decision will not allow defendants who prevail on a claim of diminished capacity " 'simply to walk out the front door of the courthouse.' " *Carpenter*, 464 Mich at 238, quoting *People v Webb*, 458 Mich 265, 281; 580 NW2d 884 (1998). If a defendant is found not guilty of an offense solely because admissible evidence negated the specific-intent element, the state can still meet its burden on a general-intent crime. Unlike insanity, diminished capacity is not a complete defense to all crimes. Defendants can, and will, be held responsible for other offenses even where they prevail in negating an element of a specific-intent crime.[11]

---

[11] Further, if a defendant were to be acquitted of all charged offenses on the basis of diminished capacity, the state would still have the ability to petition for the defendant's civil commitment through existing law. See MCL 330.1434.

The dissent argues that a diminished-capacity defense must operate within the legislative framework for insanity defenses and GBMI verdicts for a second reason. Justice ZAHRA points out that the GBMI statute requires a defendant to receive psychiatric evaluation and treatment if the defendant's insanity defense fails but the defendant proves that they were mentally ill during the crime. Because no mandatory evaluation and treatment procedure exists for the diminished-capacity defense, Justice ZAHRA argues that "the diminished-capacity defense undermines the Legislature's expressed intent that mentally ill or mentally disabled defendants receive psychiatric evaluation and treatment." But this is inaccurate. There is a vast difference between mental illness and legal insanity. The Legislature made the GBMI statute's evaluation and treatment procedures available only to those defendants who assert an insanity defense, not to all mentally ill defendants. Today's decision does not affect that policy choice. For this reason, Justice ZAHRA is incorrect that our opinion "implies that the Legislature meant to allow mentally ill defendants to go untreated if, and only if, they use their mental illness as a defense to the specific-intent element of the crime, not to the crime as a whole." To the extent Justice ZAHRA is frustrated by the lack of a comprehensive treatment procedure for mentally ill defendants who do not assert an insanity defense, his criticisms are better directed to the Legislature.

Considered together, the stare decisis factors do not weigh in favor of maintaining *Carpenter*. Although overruling *Carpenter* might require our justice system to adjust or adopt new procedures, the other factors weigh in favor of reversal. See *Petersen v Magna Corp*, 484 Mich 300, 320; 773 NW2d 564 (2009) (opinion by KELLY, C.J.) ("Not all of these factors will be applicable in every case. Nor is there a magic number of factors that must favor overruling a case in order to establish the requisite compelling justification."). *Carpenter* marked a sharp divergence from prior caselaw, without any rooting in the plain language of MCL 768.21a. We also believe that it is not in the public interest for this Court to bind lower courts to an incorrect interpretation of a legislative framework, especially when that framework is based on an evolving understanding of mental illness and other forms of mental incapacity.[12]

*Carpenter*'s flawed interpretation of the legal-insanity statute cannot be permitted to stand. See *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 181; 615 NW2d 702

Additionally, Justice ZAHRA's dissent continues to cite *Carpenter*'s incorrect reasoning that "allowing a diminished-capacity defense would 'swallow up the insanity defense and its attendant commitment provisions' " because " 'there would be scant reason indeed for a defendant to risk such confinement by arguing the greater form of mental deficiency' " if " 'psychiatric testimony were generally admissible to cast a reasonable doubt upon whatever degree of mens rea was necessary for the charged offense, thus resulting in outright acquittal . . . .' " *Carpenter*, 464 Mich at 238-239 (quotation marks and citations omitted). Justice ZAHRA continues to ignore the fact that defendants who cannot be convicted of a specific-intent crime due to diminished capacity can be convicted of a general-intent crime or can be civilly committed. See MCL 330.1434.

[12] We disagree with Justice ZAHRA that "there is no public interest at stake" in allowing defendants to be convicted of specific-intent crimes without proof of specific intent. If someone is wrongly convicted of a crime, the public interest is certainly implicated. Furthermore, the public interest is necessarily served when this Court restores the statutory interpretation that the drafting Legislature, elected by the public, intended.

23

(2000) (holding that "a judicial tribunal is most strongly justified in its reversal of precedent when adherence to such precedent would perpetuate a plainly incorrect interpretation of the language of a constitutional provision or statute").  We therefore overturn *Carpenter* and its prohibition on the admission of diminished-capacity evidence.

## V.  CONCLUSION

We hold that the *Carpenter* Court erred by ruling that the legal-insanity statute, MCL 768.21a, foreclosed the presentation of diminished-capacity evidence to contest the *mens rea* element of a charged specific-intent crime.  Based on our review of the stare decisis factors, we now overturn *Carpenter*.  We accordingly vacate the trial court's order denying defendant's motion to present evidence of and jury instructions regarding his alleged diminished capacity, and we remand this case to the trial court for further proceedings not inconsistent with this opinion.

> Richard H. Bernstein
> Megan K. Cavanagh
> Elizabeth M. Welch
> Kyra H. Bolden
> Kimberly A. Thomas
> Noah P. Hood

24

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                       No. 167120

CINECCA DAQUAN MADISON,

      Defendant-Appellant.

_____

CAVANAGH, C.J. (*concurring*).

I fully concur with the majority. I write separately to comment on the broader impact of our decision today and to provide further explanation as to how trial courts should examine diminished-capacity evidence moving forward.

As the majority explains, "Because diminished capacity is necessarily distinct from the affirmative defense of legal insanity, the Legislature's codification of the legal-insanity defense has no bearing on the admissibility of diminished-capacity evidence." The error of this Court's statutory interpretation in *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), resulted from the failure to recognize the distinction between diminished-capacity evidence and the affirmative defense of legal insanity. As I have previously observed,[1] it appears that these two distinct concepts first became erroneously intertwined when the Court of Appeals in *People v Mangiapane*, 85 Mich App 379, 395; 271 NW2d 240 (1978), concluded that "the defense known as diminished capacity comes within [the]

_____

[1] *People v Tyson*, 511 Mich 1080, 1084 n 3 (2023) (M. K. CAVANAGH, J., dissenting).

codified definition of legal insanity." Because the concepts are distinct, it appears that the *Mangiapane* panel erred when it concluded that various procedural requirements meant to apply to the affirmative defense of legal insanity applied equally to diminished-capacity evidence. *Id.* at 394. In light of our decision today, I question whether the *Mangiapane* decision and others like it[2] remain good law.[3] However, the continuing viability of those cases is not before the Court today. The only questions properly before the Court in this case are whether *Carpenter* was correctly decided and whether principles of stare decisis support overruling it.

Nonetheless, despite some open questions remaining, the Court's opinion today overruling *Carpenter* should not be interpreted as a free-for-all in regard to the introduction

---

[2] See, e.g., *People v Atkins*, 117 Mich App 430, 435-436; 324 NW2d 38 (1982) (holding that psychiatric testimony bearing on the defendant's capacity to form the requisite specific intent "can only be presented when the statutory notice requirements are fulfilled"); *People v Hollis*, 140 Mich App 589, 592; 366 NW2d 29 (1985) ("The statutory procedures are equally applicable to the insanity and diminished capacity defenses.").

[3] Because I question the continued propriety of the post-*Mangiapane* caselaw imposing statutory insanity-defense requirements (like the mandate to undergo a criminal-responsibility examination at the Center for Forensic Psychiatry, see MCL 768.20a(2)), on the common-law diminished-capacity defense, I do not necessarily share the same concerns as Justice HOOD in regard to increased potential strain on the current insanity legislative and administrative framework. That is, I am unconvinced that in light of today's opinion there is any support for a statutorily required "diminished-capacity evaluation," as there is with an insanity examination, MCL 768.20a(2). Nevertheless, I agree with Justice HOOD and the majority that today's decision will require adjustments that may impact court operations.

2

of evidence of mental illness[4] or intellectual disability.[5]  All pertinent rules of evidence continue to apply.  For example, pursuant to MRE 401, trial courts must ensure that the evidence of mental illness or intellectual disability, if not part of an affirmative defense of legal insanity, is relevant to negating the specific intent included in the charged offense.[6]  Moreover, pursuant to MRE 403, trial courts may exclude minimally probative evidence where its evidentiary value is substantially outweighed by, for example, unfair prejudice or confusion of the issues.  And any expert testimony remains subject to MRE 702.[7]

---

[4] See MCL 330.1400(g) (defining "mental illness" as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life").

[5] See MCL 330.1100b(13) (defining "intellectual disability" as "a condition manifesting before the age of 18 years that is characterized by significantly subaverage intellectual functioning and related limitations in 2 or more adaptive skills" and that must be diagnosed based on statutorily defined assumptions).

[6] Unlike insanity, diminished capacity is not a complete defense to all charged crimes.  If a defendant presents evidence of diminished capacity and is acquitted of an offense with a specific-intent element, the defendant can, and in many cases will, still be found guilty of lesser or related offenses that lack the specific intent negated by diminished capacity.

[7] I note that MCL 767.94a(1) requires the defense to disclose to the prosecuting attorney the nature of any defense intended to be established at trial by expert testimony and the report of said expert.  See also MCR 6.201(A).  In addition, I support the Court's adoption of a new court rule, MCR 6.201(B), modeled after FR Crim P 12.2(b), which "is designed to give the government an opportunity to obtain the expert witnesses they ordinarily will need" to counter the defendant's use of expert witness testimony in regard to mental conditions.  *United States v Hudson*, 566 F2d 889, 890 (CA 4, 1977).  This court rule is adopted effective immediately simultaneous with today's decision.  See ADM File No. 2026-09, ___ Mich ___ (2026).

Further, until the Committee on Model Criminal Jury Instructions has an opportunity to publish a diminished-capacity instruction, litigants may look to prior instructions for guidance.  For example, CJI 6:1:02A, Diminished Capacity, could be slightly modified with contemporary terminology for mental illness and intellectual disability.

3

While today's opinion leaves some issues unsettled, were it not for the erroneous *Carpenter* decision, as Justice HOOD aptly explains, "the logistical issues that this decision implicates would have arisen gradually instead of suddenly . . . ." See also *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 243; 828 NW2d 660 (2013) (noting that the common law "typically develops incrementally"). I agree with the majority that *Carpenter* was wrongly decided and that the stare decisis factors support today's decision to overrule it. While there are undoubtedly new questions and issues that will arise in the wake of our holding, we, counseled by judicial restraint, leave them for another day.

Megan K. Cavanagh
Elizabeth M. Welch

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                        No. 167120

CINECCA DAQUAN MADISON,

      Defendant-Appellant.

_____

WELCH, J. (*concurring*).

I fully concur with the majority. I also agree with Justice HOOD that lower courts will face postconviction motions from defendants seeking to apply today's decision to cases that were long ago decided. Although not before us today, I write to highlight some helpful aspects of our retroactivity jurisprudence. We recently revisited the topic in *People v Robinson*, ___ Mich ___, ___; ___ NW3d ___ (February 4, 2026) (Docket No. 167595); slip op at 8-11.

Under a federal retroactivity analysis, new rules are not applied retroactively unless they announce a substantive rule of constitutional law. *People v Barnes*, 502 Mich 265, 268-269; 917 NW2d 577 (2018); *Montgomery v Louisiana*, 577 US 190, 198; 136 S Ct 718; 193 L Ed 2d 599 (2016). An opinion announces a new substantive rule of constitutional law if it "forbids 'criminal punishment of certain primary conduct' or prohibits 'a certain category of punishment for a class of defendants because of their status or offense.'" *Montgomery*, 577 US at 206 (citation omitted). See also *People v Poole*, ___ Mich ___, ___; ___ NW3d ___ (April 1, 2025) (Docket No. 166813); slip op at 10,

quoting *Montgomery*, 577 US at 201.  Substantive rules are distinct from procedural rules, which "regulate only the *manner of determining* the defendant's culpability . . . ."  *Schriro v Summerlin*, 542 US 348, 353; 124 S Ct 2519; 159 L Ed 2d 442 (2004).

Additionally, if a rule is not retroactive under federal law, courts must consider whether it is retroactive under Michigan law.  See *Robinson*, ___ Mich at ___; slip op at 10.  Under Michigan law, a court decision is applied retroactively if it satisfies the *Linkletter-Hampton* factors.  *People v Hampton*, 384 Mich 669; 187 NW2d 404 (1971); *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965).  Those factors are: "(1) the purpose of the new rule; (2) the general reliance on the old rule; and (3) the effect on the administration of justice."  *Hampton*, 384 Mich at 674.  With respect to the third factor, Justice HOOD aptly sets forth the challenges our courts already are facing regarding mental health evaluations in the criminal justice system.  Our retroactivity framework allows judges to consider the practical challenges placed upon the criminal justice system.[1]

In short, this Court has articulated the process for determining retroactivity.  Our courts can look to *Robinson* and the other cited cases for guidance when deciding the postconviction motions that rely upon today's opinion.

Elizabeth M. Welch

---

[1] See *Barnes*, 502 Mich at 274 ("Because of this general reliance on the old rule, the effect on the administration of justice to extend the *Lockridge* rule retroactively on collateral review would be incalculable, with potentially every criminal defendant sentenced in at least the last 19 years being eligible for relief.  Consequently, we hold that *Lockridge* will be given only prospective application on collateral review."), citing *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

2

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                          No. 167120

CINECCA DAQUAN MADISON,

      Defendant-Appellant.

_____

HOOD, J. (*concurring*).

I respectfully concur with the majority opinion. I agree with the top line of the majority opinion: *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), was wrongly decided. And, ultimately, I agree with the bottom line of the majority opinion: we must overturn it. But I reach that agreement cautiously because I have grave concerns about the ripple effect this decision will have on every level of our court system.

Specifically, I must acknowledge that the decision to overturn *Carpenter* carries with it a deluge of logistical, operational, and funding challenges that will have both immediate and distal impacts on our courts. Most immediately, this decision will create further pressure and obligations on the already underfunded and stripped-down mental health infrastructure. It will create widespread slowdowns in criminal cases, which will affect defendants awaiting trial, victims and witnesses waiting for their day in court, and the public, which has a continuing interest in courts administering criminal cases as quickly as we can do it fairly.

My concerns fall into three categories. First, I acknowledge that this decision does not just overturn *Carpenter*, but it also may have impacts on legislative and administrative frameworks that have developed around not-guilty-by-reason-of-insanity (NGRI) adjudications. Second, I am most concerned with the impact this decision will have on our ability to efficiently manage criminal proceedings. Third, I am concerned that this decision will dramatically increase postconviction motions and appeals that will necessarily seek to define the scope of today's decision. I address each concern in turn.

The majority opinion accurately summarizes the background of this case. It also accurately states our principles of stare decisis. See *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000). Specifically, we should review "whether the decision at issue defies practical workability, whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision." *Id*. at 464 (quotation marks and citation omitted).

At the threshold, I must emphasize that *Carpenter* represented a departure from the trajectory of our caselaw and the development of our common law. See *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 369; 792 NW2d 686 (2010). See also *Lancaster v Metrish*, 683 F3d 740, 752 (CA 6, 2012), rev'd 569 US 351 (2013); *People v Tyson*, 511 Mich 1080 (2023) (CLEMENT, C.J., concurring); *id*. at 1081 (M. K. CAVANAGH, J., dissenting). Had our caselaw been allowed to develop without the interruption that was *Carpenter*, the logistical issues that this decision implicates would have arisen gradually instead of suddenly and would have posed less of an acute problem.

The focus of my disagreement with the majority's stare decisis analysis relates to the second factor: whether overruling *Carpenter* would work an undue hardship because

of reliance on that case. I understand and acknowledge that this is a strange framing of this issue. Put differently, what we are talking about is the damage that overturning *Carpenter* will do.

It is worth noting that overturning *Carpenter* will not just be a change in our common law. Stare decisis principles often caution against overturning common law developments because the public needs to rely on predictable standards and rules. See *McCormick v Carrier*, 487 Mich 180, 210-211; 795 NW2d 517 (2010) (opinion by M. F. CAVANAGH, J.). In this area of law, complex, but relatively predictable, administrative and legislative frameworks have developed around criminal insanity and NGRI adjudications. See, e.g., *Duckett v Solky*, 341 Mich App 706; 991 NW2d 852 (2022) (describing one aspect of the complex administrative framework that applies to individuals adjudicated NGRI). Unlike a decision that overturns a single case or a single line of precedent, this decision will also complicate these existing legislative and administrative frameworks. Ultimately this causes hesitation. But none of these concerns are insurmountable. I nonetheless must acknowledge them.

My most serious concerns relate to the impact this decision will have on court operations. Once this rule takes effect, presumably we are saying that individuals charged with a crime—who cannot afford an independent diminished-capacity evaluation—will receive a diminished-capacity evaluation (akin to the present criminal-responsibility evaluation) at the state's expense.[1] As the majority observes, the threshold for diminished

---

[1] I acknowledge that this is an assumption. The question of whether an individual has a right to a diminished-capacity evaluation, or augmented criminal-responsibility evaluation, at the state's expense either through the Center for Forensic Psychiatry or through an independent expert is not presently before us.

capacity is lower than criminal insanity. So, presumably, more individuals will be eligible for an evaluation. This means that the state will be responsible for doing a criminal-responsibility review in an entirely new class of cases. This review will apply more broadly than in the narrow class of cases that presently require criminal insanity evaluations.

It is impossible to know how many defendants will request—or how many defendants the trial courts will refer for—diminished-capacity evaluations. Many of those referrals will be bona fide requests. And at least some of those referrals will support a diminished-capacity defense.[2] For those individuals, the rule under *Carpenter* was unworkable, as the majority points out. But many of the requests for evaluation of criminal responsibility under this new standard will not result in support for a diminished-capacity defense.

Acknowledging that we do not know how many defendants will request or receive diminished-capacity evaluations, this decision will trigger requests in new cases on a scale that our system is ill-equipped to process. By way of illustration, between 1991 and 2003, Michigan closed seven state psychiatric hospitals for adults with serious mental illnesses and five psychiatric hospitals for children with serious emotional disturbances. See Michigan House of Representatives Hearing on Mental Health, *Evolution of Michigan's Public Mental Health System* (March 15, 2023), p 23, available at

---

[2] Arguably, all referrals for such an evaluation should increase our confidence in the outcome of a criminal proceeding. In other words, an evaluation that indicates a defendant's diminished capacity may decrease the likelihood of a wrongful or unjust conviction. And an evaluation that indicates that a defendant does not have a diminished capacity will increase our confidence that a conviction or acquittal was based on complete and high-confidence facts.

<https://www.house.mi.gov/hfa/PDF/HealthandHumanServices/DHHS_Subcmte_Testimony_Evolution_of_MI_PublicHealthSys_JPatton_3/15/23.pdf> (accessed June 18, 2026) [https://perma.cc/JJ33-US7Y]. There are presently three regional state psychiatric hospitals for adults (Kalamazoo Psychiatric Hospital, Walter P. Reuther Psychiatric Hospital, and Caro Regional Mental Health Center) in addition to the Center for Forensic Psychiatry (the CFP). See *id*. at 43; see also Michigan Senate Fiscal Agency, *State of Michigan Mental Health Facilities* (February 7, 2022), available at <https://sfa.senate.michigan.gov/Chart/2022/Chart-Michigan_Mental_Health_Facilities-020722.pdf> (accessed June 18, 2026) [https://perma.cc/7H3D-2PAY]. The CFP has 272 beds with approximately the same number of regional hospital beds. Center for Forensic Psychiatry (Witherell & Moore), "Competency to Stand Trial," PowerPoint Presentation, 2026 Oakland County District Court Bench/Bar Conference, Bloomfield Hills, MI, March 20, 2026, p 19. What that means is, at present, the CFP is already overwhelmed and backlogged. See *id*. The current demand of competency and criminal-responsibility referrals already impacts the timeliness of cases. Cf. *id*. With the Court's decision in this case, we are adding to those cases. And potentially substantially adding to them.

This is going to have a massive impact on how cases progress through the criminal justice system. For starters, it will slow down every case in which there is a referral. This will implicate a defendant's right to a speedy trial. This will also impact victims' and witnesses' rights to have their day in court. It will impact trial judges' ability to comply with time standards that this Court has set. Those standards are not arbitrary. They are there to ensure the fair and efficient administration of justice.

This addition of cases to the CFP's caseload will not just impact the newly added cases, but it will affect the cases that would be before the CFP under the current post-*Carpenter* framework. Put differently, it will slow down the new cases and the old cases. Overturning *Carpenter* therefore requires us to do a balancing act. On one hand, there is the justice interest in having the correct rule—a rule that allows a diminished-capacity defense. Many defendants have been and are being shortchanged because we have long foreclosed what would otherwise be a viable defense. Further, our society has a vested interest in having a just result from criminal proceedings. On the other hand, we must consider the interest of those defendants and others (who may or may not have a diminished-capacity issue) in having their cases swiftly heard. Our society has a vested interest in efficient criminal proceedings, too. Will victims or witnesses lose their nerve to testify during the added wait between these referrals and trial? We do not know. And this implicates all—but does not squarely favor any—of the stare decisis factors.

Finally, I have a less-pressing but equally serious related concern about the distal impacts of this decision on postconviction proceedings and appeals. By overturning *Carpenter*, we are triggering a wave of postconviction motions and appeals that will seek to clarify the reach of this decision. As stated, *will indigent defendants be entitled to an evaluation at the state's expense? Will the trial court or prosecution be able to compel an examination? Will this decision apply retroactively?*[3] None of these questions are

---

[3] I emphasize that the question of the retroactive application of today's rule is not presently before us. At risk of stating the obvious, the rule that we are announcing, if it applies retroactively, will have a massive impact on our court system. To the extent that the prospect of the logistical and funding problems related to retroactive application of this

6

presently before us, but we cannot completely avoid our responsibility to faithfully consider the implications of overturning *Carpenter*. Regardless of how we answer these questions, in the near future there will be a substantial increase in postconviction motions and appeals from litigants who will seek clarification on the breadth of this case's holding. The trial courts will be the first to experience the increase in filings. This will impact the efficient administration of justice up to and through the appellate courts. And it is another concern that would caution against overturning *Carpenter*.

There are numerous counterarguments to these concerns. And there are numerous rebuttals to those counterarguments. There is, however, one counterargument to which I have found no rebuttal. That is why I concur rather than dissent. The strongest counterargument to this logistical nightmare is what Justice Brennan described as "a fear of too much justice." *McCleskey v Kemp*, 481 US 279, 339; 107 S Ct 1756; 95 L Ed 2d 262 (1987) (Brennan, J., dissenting). Similar concerns about the logistical nightmare of a judicial decision could have been raised when courts first recognized the right to appointed counsel in state criminal proceedings. Cf. *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963). Similar concerns could have been raised when courts first announced our rules regarding competency or criminal-responsibility evaluations at the state's expense. Cf. *Dusky v United States*, 362 US 402; 80 S Ct 788; 4 L Ed 2d 824 (1960). Our system has been able to figure these things out. I have no doubt we will be able to figure this out, too.

---

case causes concern, we should address that concern in our stare decisis analysis, instead of allowing it to mold our retroactivity analysis in some potential future case.

I join the majority opinion clear-eyed about the challenge before us. I offer my full-throated support for administrative review of our court rules to support our trial courts and Court of Appeals in addressing the challenges that this Court's decision will inevitably pose. And I encourage the Legislature to monitor this issue because many of the concerns I have identified likely can be fixed only through appropriate legislation and funding.

I respectfully join the majority.

Noah P. Hood

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

No. 167120

CINECCA DAQUAN MADISON,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

      For nearly 25 years, courts, prosecutors, and criminal defendants have understood that, pursuant to MCL 768.21a, evidence of mental illness bearing on criminal culpability is admissible only under the defense of legal insanity. Specifically, in *People v Carpenter*, this Court held that a defense of diminished capacity is not permitted by MCL 768.21a.[1] *Carpenter*'s interpretation of MCL 768.21a has withstood the test of time. Even on collateral review, the Supreme Court of the United States unanimously accepted the *Carpenter* Court's "reasonable interpretation of the language of a controlling statute," i.e., MCL 768.21a, as barring evidence of mental illness on criminal culpability unless presented under the defense of legal insanity.[2]

      Notwithstanding this longstanding stability in the law, today, a majority of the Court overrules *Carpenter*. This decision plainly controverts the clear intent of the Legislature,

_____

[1] *People v Carpenter*, 464 Mich 223, 237; 627 NW2d 276 (2001).

[2] *Metrish v Lancaster*, 569 US 351, 368; 133 S Ct 1781; 185 L Ed 2d 988 (2013).

generates a host of new and unanswered questions, and ignores the dictates of stare decisis. The majority opinion departs from *Carpenter*'s sound reasoning and substitutes its own results-driven interpretation of the statute. Along the way, the majority opinion selectively reads or badly misreads caselaw and ignores obvious indications of statutory intent.

*Carpenter* was faithful to the applicable statutory scheme and rightly decided. For this reason, I dissent. I would not overrule *Carpenter* but would instead reaffirm *Carpenter* and the nearly 25 years in which it has properly, easily, and clearly been applied throughout Michigan's judicial system.

## I. RELEVANT STATUTES

A trio of Michigan statutes address mental illness with respect to criminal liability.[3] First, the legal-insanity statute allows defendants to plead legal insanity as defined in MCL 768.21a(1), which states, in pertinent part, that "[i]t is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense." Legal insanity is defined as occurring when the defendant "lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law."[4] Second, if the defendant is found not guilty by reason of insanity, MCL 330.2050(1) requires the court to "immediately commit any person who is acquitted of a criminal charge by reason of insanity to the custody of the center for forensic psychiatry, for a period not to exceed 60 days." The Center for Forensic Psychiatry must file a report

---

[3] MCL 768.21a, MCL 330.2050, and MCL 768.36.

[4] MCL 768.21a(1).

2

with the court within the 60-day period that includes "an opinion as to whether the person meets the criteria of a person requiring treatment or for judicial admission as defined by [MCL 330.1401] or [MCL 330.1515], and the facts upon which the opinion is based."[5] After receiving the report, "the court may direct the prosecuting attorney to file a petition pursuant to [MCL 330.1434] or [MCL 330.1516] for an order of hospitalization or an order of admission to a facility . . . ."[6] Third, the "guilty but mentally ill" (GBMI) verdict is defined in MCL 768.36. That section states, in pertinent part:

> (1) If the defendant asserts a defense of insanity in compliance with [MCL 768.20a], the defendant may be found "guilty but mentally ill" if, after trial, the trier of fact finds all of the following:
>
> (a) The defendant is guilty beyond a reasonable doubt of an offense.
>
> (b) The defendant has proven by a preponderance of the evidence that he or she was mentally ill at the time of the commission of that offense.
>
> (c) The defendant has not established by a preponderance of the evidence that he or she lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law.

If the defendant is committed to the Department of Corrections, the statute requires that "the defendant shall undergo further evaluation and be given such treatment as is psychiatrically indicated for his or her mental illness or intellectual disability."[7]

---

[5] MCL 330.2050(2).

[6] MCL 330.2050(3).

[7] MCL 768.36(3).

## II. ANALYSIS

The majority opinion holds that defendant may present evidence of diminished mental capacity to cast doubt on the specific-intent requirement of the charge of first-degree murder. Neither the language and structure of the relevant statutes nor the various sources of support highlighted in the majority opinion justify its legal conclusions or its overturning of *Carpenter*.

### A. A DEFENSE OF *CARPENTER*'S STATUTORY INTERPRETATION

The majority opinion claims that the legal analysis in *Carpenter* "turns the canons of statutory interpretation on their head." Notwithstanding this bold proclamation, the majority opinion fails to cite a single canon of construction to support its interpretation. Justice BERNSTEIN, writing for the majority, proclaims that the *Carpenter* Court failed "to properly focus on the language of MCL 768.21a" and "expended little effort on interpreting the language of MCL 768.21a . . . ." Justice BERNSTEIN further observes that the statute addresses only the affirmative defense of legal insanity, while remaining silent on the issue of diminished capacity. Justice BERNSTEIN notes that "the statute simply does not state or imply anything about the availability of diminished-capacity evidence to negate a specific element of a crime." Far from "turn[ing] the canons of statutory interpretation on their head," it was the *Carpenter* majority that correctly employed the canons; it is today's majority opinion that upends the canons.

## 1. THE RELEVANT CANONS

It is true that, as the majority opinion notes, "[c]ourts may not speculate regarding legislative intent beyond the words expressed in a statute."[8]  This is a restatement of the principle that the words of a statute control, not the judicially perceived legislative purpose divined from an extratextual source.  "The words of a statute provide the most reliable indicator of the Legislature's intent and should be interpreted on the basis of their ordinary meaning and the overall context in which they are used."[9]  Indeed, trying to determine legislative intent from anything other than the text of the statute offends the maxim that "[i]ntent is elusive for a natural person, fictive for a collective body."[10]  Every rehearsal of this principle of interpretation is a welcome breeze of textualism from the majority.

Bearing that in mind, it is also true that "[a]dhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text."[11]  As Justice BERNSTEIN himself noted on an earlier occasion, "[W]e do not read statutory language in isolation and must construe its meaning in light of the context of its use."[12]  This is known as the "whole text" canon of statutory interpretation.  It "calls on the

---

[8] *Mich Ed Ass'n v Secretary of State (On Rehearing)*, 489 Mich 194, 217-218; 801 NW2d 35 (2011) (quotation marks and citation omitted).

[9] *People v Flick*, 487 Mich 1, 10-11; 790 NW2d 295 (2010), citing *People v Lowe*, 484 Mich 718, 721-722; 773 NW2d 1 (2009).

[10] Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv J L & Pub Pol'y 61, 68 (1994).

[11] Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 356.

[12] *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 367-368; 917 NW2d 603 (2018).

judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."[13] When employing the canon, "[w]e must 'examine the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme.' "[14] "Although a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context."[15] In choosing among possible interpretations, "we must select the meaning that makes the most sense when the statute is read as a whole."[16]

One particular mode of interpretation falling within the ambit of the "whole text" canon is argument from statutory structure.[17] "[S]tructural argument in all its forms presumes that statutes are, to some degree, 'logically or aesthetically ordered or integrated,' 'having clarity or intelligibility.' "[18] There are several species of structural argument, but the one most relevant to the present case is known as operational structural argument. Operational structural argument "assumes that [a legislature] designs coherent statutory

---

[13] *Reading Law*, p 167.

[14] *Ally Fin Inc v State Treasurer*, 502 Mich 484, 493; 918 NW2d 662 (2018), quoting *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014).

[15] *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003), citing *McCarthy v Bronson*, 500 US 136, 139; 111 S Ct 1737; 114 L Ed 2d 194 (1991), and *Hagen v Dep't of Ed*, 431 Mich 118, 130-131; 427 NW2d 879 (1988).

[16] *South Dearborn Environmental Improvement Ass'n, Inc*, 502 Mich at 369.

[17] Note, *Statutory Structure*, 132 Yale L J 1528, 1532 (2023).

[18] *Id*. at 1534, citing *Merriam-Webster.com Dictionary*, coherent <https://www.merriam-webster.com/dictionary/coherent> (accessed September 10, 2022) [https://perma.cc/GPT3-UAMY].

schemes, understood as legislative programs that provide direction to actors."[19] It functions "by interpreting the statute in the most harmonious way possible and by declining to adopt interpretations of a provision that would undermine, contradict, or defeat the point of other provisions."[20] Specifically, operational structural arguments "assum[e] that [a legislature] does not mean to create Frankenstein's monsters or legislative programs that constantly undermine themselves by pursuing contradictory goals or by coming into operational conflict."[21]

## 2. APPLICATION TO THE PRESENT CASE

Putting these principles of interpretation into action, the *Carpenter* majority held that Michigan statutes preclude the use of the diminished-capacity defense. They were right to so conclude.

It is true that the diminished-capacity defense is formally different from the defense of legal insanity. As the majority opinion notes, the defense of legal insanity is an affirmative defense, meaning that the defendant admits to the crime but pleads "not guilty" as a result of the fact of the defendant's insanity. The diminished-capacity defense, by contrast, calls into doubt one of the elements of the crime—*mens rea*. By showing that the defendant could not have possessed the requisite mental state, the defendant undermines the prosecution's case on that element and the charge must be reduced to a lesser crime involving a mental state the defendant *was* capable of possessing. Thus, the insanity and

---

[19] *Statutory Structure*, 132 Yale L J at 1535.

[20] *Id*.

[21] *Id*. at 1564.

7

diminished-capacity defenses use different mechanisms to attack the prosecution's case against the defendant.

Yet, despite the mechanistic differences, the diminished-capacity defense is not as different from the insanity defense as the majority opinion would have us believe. The majority opinion contends that the diminished-capacity defense is "fundamentally distinct" from the legal-insanity defense. A closer look at the statutes suggests otherwise.

Michigan statutes collectively ensure that when a mentally ill defendant commits an offense, the defendant cannot "simply . . . walk out the front door of the courthouse."[22] Under MCL 330.2050, defendants acquitted by reason of insanity are committed for evaluation and possible long-term treatment. And MCL 768.36 also provides for psychiatric evaluation and treatment in prison for defendants convicted under a GBMI verdict. Thus, even defendants who do not meet the definition of legal insanity but still suffer from mental health issues are committed for psychiatric evaluation and treatment. These provisions set forth a comprehensive scheme detailing the legal and treatment-based pathways appropriate for defendants suffering from mental health issues.

Contrast these statutory provisions with the diminished-capacity defense embraced in the majority opinion. The diminished-capacity defense has no governing statute and, as a result, has no requirement that the defendant be evaluated and treated for mental illness. Consequently, a defendant who asserts a diminished-capacity defense may realistically avoid a charge as serious as one of first-degree murder or assault with intent to commit

---

[22] *Carpenter*, 464 Mich at 238, quoting *People v Webb*, 458 Mich 265, 281; 580 NW2d 884 (1998).

criminal sexual conduct, all on the basis of his or her mental illness. And yet, such a defendant will not be subject to mandatory psychiatric evaluation and treatment.[23]

These results are asymmetric, to say the least. More accurately, the majority opinion's interpretation of these statutes renders them inconsistent and random, violating the canons of statutory interpretation described above. By allowing culpable mentally ill defendants to assert the diminished-capacity defense, the interpretation adopted in the majority opinion obscures the Legislature's expressed will in MCL 330.2050 and MCL 768.36(3). Why would mentally ill defendants receive psychiatric evaluation and treatment if they are legally insane or guilty but mentally ill but *not* receive similar treatment if they assert their mental illness as a partial defense to even the most serious of crimes? The majority opinion contradicts the principle of operational statutory coherence. It implies that the Legislature meant to allow mentally ill defendants to go untreated if, and only if, they use their mental illness as a defense to the specific-intent element of the crime, not to the crime as a whole. This suggests that the Legislature "undermine[d itself] by pursuing contradictory goals . . . ."[24] The creation of a diminished-capacity defense therefore undermines the comprehensive statutory scheme set forth by the Legislature.

---

[23] The majority opinion notes that a successful diminished-capacity defense does not necessarily mean acquittal. This misses the point: Whether a defendant can still be convicted of a different crime does not change the fact that the diminished-capacity defense undermines the Legislature's expressed intent that mentally ill or mentally disabled defendants receive psychiatric evaluation and treatment. The majority opinion's attempt to cover this gap by suggesting that the state can petition for a criminal defendant's civil commitment just like it could for any other member of the public is similarly unavailing. The existence of other measures for addressing mental illness does not justify the majority opinion's departure from the structure and meaning of the statute.

[24] *Statutory Structure*, 132 Yale L J at 1564.

Moreover, that the Legislature intended to exclude the diminished-capacity defense is evidenced by the very statement included at the end of MCL 768.21a(1). The Legislature did not need to state that "[m]ental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity"—this was already inherent in the definition of legal insanity as provided earlier in the subsection. It is not obvious that a statutory definition of such a critical term as "legal insanity" would leave room for other definitions of legal insanity. Rather, a statutory definition inherently precludes other definitions, leaving no need for the inclusion of a statement that the definition is exclusive. Ignoring this principle, the majority opinion renders this provision superfluous. Yet "[i]t is axiomatic that 'every word in the statute should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory.' "[25] The majority opinion undermines this basic rule of interpretation.

In addition, these arguments defeat the majority opinion's accusation that the *Carpenter* majority read "beyond the words expressed in the statute."[26] Rather, the conclusion that MCL 768.21a prohibits diminished-capacity evidence is a logical consequence of the words in the statute. This is evident not only from the substance of the *Carpenter* majority's holding but also from its choice of words:

> Central to our holding is the fact that the Legislature has already contemplated and *addressed* situations involving persons who are mentally ill or retarded yet not legally insane. As noted above, such a person may be found "guilty but mentally ill" and must be sentenced in the same manner as any other defendant committing the same offense and subject to psychiatric

---

[25] *Duffy v Dep't of Natural Resources*, 490 Mich 198, 215; 805 NW2d 399 (2011), quoting *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011) (brackets omitted).

[26] *Mich Ed Ass'n*, 489 Mich at 217-218.

10

evaluation and treatment.  MCL 768.36(3).  Through this statutory provision, the Legislature has *demonstrated* its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent.[27]

The *Carpenter* majority explained that the Legislature had "addressed" the circumstances and "demonstrated" its policy choices.  These words confirm that the *Carpenter* majority discerned its interpretation of the statute from the statute itself, not from speculation about legislative history or intent.  The majority opinion's approach, by contrast, trivializes the nuanced analysis inherent in the interpretation of complex statutory schemes and ignores the reality of the intricate context in which statutes exist.

## B.  THERE IS NO REASON TO REVISIT *CARPENTER*

The majority opinion cites three reasons to conclude that *Carpenter* was wrongly decided.  First, the majority opinion looks at pre-enactment caselaw regarding the insanity defense and the defense of diminished capacity.  The majority opinion eagerly cites pre-*Carpenter* caselaw for the proposition that the diminished-capacity defense and the legal-insanity defense can coexist.  How odd, then, that the very same caselaw also recognizes the fundamental similarity between the two.  For example, the *Mangiapane* Court concluded that "the defense known as diminished capacity comes *within this codified definition of legal insanity*."[28]  If the two defenses are so different that legislation regarding one defense could not possibly have anything to do with the other (as the majority opinion would have us believe), then why did the *Mangiapane* Court believe that the codified definition of legal insanity includes the diminished-capacity defense?  But there is more.

---

[27] *Carpenter*, 464 Mich at 237 (emphasis added).

[28] *People v Mangiapane*, 85 Mich App 379, 395; 271 NW2d 240 (1978) (emphasis added).

11

The majority opinion also cites *People v Denton*, which applied the procedural requirements of asserting a legal-insanity defense to the defense of diminished capacity.[29] And again, the majority opinion cites *People v Anderson*, which expressly stated that "[t]here is no statutory definition of diminished capacity. Rather, diminished capacity is part of the law of insanity."[30] Why would these cases apply the procedural requirements of legal insanity and classify the diminished-capacity defense as being "part of" or coming "within" the law of legal insanity? Evidently, the Court of Appeals in these cases recognized that the diminished-capacity defense achieves a very similar goal to the legal-insanity defense—so much so that it would not be right to allow the diminished-capacity defense to operate independently of the law of legal insanity, as the *Carpenter* majority held.[31]

Curiously, the majority opinion next finds support in the fact that "*criminal defendants* have repeatedly questioned the validity of *Carpenter*'s holding."[32] Of *course* criminal defendants question the validity of *Carpenter*! *Carpenter* foreclosed their ability to circumvent the Legislature's scheme for the presentation of intellectual-disability evidence and mental-illness evidence in the criminal context. It would be surprising if

---

[29] *People v Denton*, 138 Mich App 568, 570-572; 360 NW2d 245 (1984).

[30] *People v Anderson*, 166 Mich App 455, 464; 421 NW2d 200 (1988).

[31] To her credit, Chief Justice CAVANAGH recognizes that this caselaw is no longer viable in light of the majority opinion. By contrast, the majority opinion relies on these cases but cautions that "[w]e do not intend to suggest that this line of caselaw is without fault." In doing so, the majority opinion conveniently disregards the negative aspects of pre-*Carpenter* caselaw while embracing those portions of the caselaw that support its position.

[32] Emphasis added.

12

criminal defendants did *not* repeatedly question the validity of *Carpenter*. Obviously, what an interested party thinks or says has no bearing on the correctness of our caselaw. The frequency of dissent from criminal defendants is a totally inappropriate consideration for this Court. It is our duty to consider arguments, weigh reason, and apply statutes, caselaw, and common sense. It is an egregious dereliction of our duty to conduct statutory interpretation by polling those with a glaringly obvious ulterior motive distorting their arguments.

For its final source of support, the majority opinion states that "[c]ourts, too, have questioned the basis for the *Carpenter* decision." The majority opinion's supporting examples fall woefully short of proving this point. The majority opinion points to *Lancaster v Metrish*, a decision of the United States Court of Appeals for the Sixth Circuit regarding a habeas petition from a man convicted of murder in Michigan.[33] The majority opinion notes that the Sixth Circuit held that " 'the 2001 judicial elimination of the diminished-capacity defense here was . . . unforeseeable' for purposes of retroactive application[.]"[34] This borders on the dishonest. It is true that the Sixth Circuit questioned *Carpenter*'s retroactive application. But although the majority opinion notes by way of citation that *Lancaster* was reversed, the majority opinion conveniently omits the fact that the United States Supreme Court specifically reversed the very finding that the majority opinion cites. The Supreme Court held that "the Michigan Court of Appeals' decision applying *Carpenter* retroactively does not warrant disapprobation as 'an unreasonable

---

[33] *Lancaster v Metrish*, 683 F3d 740 (CA 6, 2012), rev'd 569 US 351 (2013).

[34] Quoting *Lancaster*, 683 F3d at 752.

application of . . . clearly established [f]ederal law.' "[35]  Moreover, the Court held that the *Carpenter* decision was "based on the [Michigan] supreme court's reasonable interpretation of the language of a controlling statute."[36]  Instead of acknowledging that the Sixth Circuit's "questioning" of *Carpenter* (an inaccurate description of the Sixth Circuit's holding) was overruled by the Supreme Court, the majority opinion presents it as a credible criticism of *Carpenter*.  As long as we are relying on overruled and out-voted opinions, however, the majority opinion should also take into account Chief Judge Batchelder's conclusion that the " 'Michigan Court of Appeals['] denial of Lancaster's due process claim was reasonable . . . because the diminished-capacity defense was not well-established in Michigan and its elimination was, therefore, foreseeable.' "[37]

As its second example of courts questioning *Carpenter*, the majority opinion highlights *People v Tyson*, in which this Court recently questioned whether *Carpenter* was wrongly decided.[38]  In the end, however, *Tyson* did not overrule *Carpenter*.  And one of

---

[35] *Metrish*, 569 US at 365, quoting 28 USC 2254(d)(1) (alterations in *Metrish*).

[36] *Metrish*, 569 US at 368.  The majority opinion responds that the burden the defendant faced in *Metrish* was a high one.  This makes no difference.  Regardless of the standard of review, the statement by the United States Supreme Court that *Carpenter* was a "reasonable interpretation of the language of a controlling statute," *id*., stands as a self-contained endorsement of *Carpenter*.  Moreover, the majority opinion's citation of overruled precedent belies the dearth of caselaw questioning *Carpenter*.

[37] *Id*. at 357, quoting *Lancaster*, 683 F3d at 755 (Batchelder, C.J., dissenting) (alterations in *Metrish*).

[38] *People v Tyson*, 509 Mich 1049 (2022).  This Court denied leave to appeal in *Tyson* after hearing oral argument to consider whether *Carpenter* should be overruled.  *People v Tyson*, 511 Mich 1080 (2023).  Chief Justice CLEMENT concurred in the denial order, and Justice CAVANAGH dissented, joined by Justices WELCH and BOLDEN.

14

the four justices who doubted the soundness of *Carpenter*, Justice CLEMENT, nonetheless "question[ed] whether the Court is the appropriate body to reconsider the viability of a diminished-capacity defense in Michigan,"[39] suggesting that any change in the *Carpenter* rule should be implemented by the Legislature.

More importantly, it is unpersuasive for the majority opinion to cite itself from three years ago as evidence that "[c]ourts, too, have questioned the basis for the *Carpenter* decision." This is particularly true when the observations of three justices amount to nothing more than dicta, at most. In reality, the fact that three members of this Court three years ago questioned the correctness of *Carpente*r stands for nothing more than the unremarkable proposition that the majority's views have not changed.

## C. STARE DECISIS

Nonetheless, a majority of the Court has concluded that *Carpenter* was wrongly decided. The mere fact that a case is subsequently found to have been wrongly decided, by itself, does not necessarily mean that overruling it is appropriate.[40] Rather, stare decisis is generally "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and

---

[39] *Tyson*, 511 Mich at 1081 (CLEMENT, C.J., concurring). The majority opinion answers that it has the authority to reverse *Carpenter* to ensure that criminal defendants are not convicted of specific-intent crimes when they do not have the capacity to form specific intent. However, as previously noted, there is no due-process right to present a diminished-capacity defense, meaning that today's decision falls in the realm of policy, which is undoubtedly the Legislature's purview.

[40] *Robinson v Detroit*, 462 Mich 439, 465; 613 NW2d 307 (2000).

15

contributes to the actual and perceived integrity of the judicial process."[41]  Indeed, "principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed."[42]  At the same time, "stare decisis is not to be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions . . . ."[43]  Instead, we must acknowledge that "stare decisis is a principle of policy rather than an inexorable command, and that the Court is not constrained to follow precedent when governing decisions are unworkable or are badly reasoned."[44] Accordingly, this Court has set forth the following factors pertinent to the stare decisis analysis:

> (1) "whether the rule has proven to be intolerable because it defies practical workability," (2) "whether reliance on the rule is such that overruling it would cause a special hardship and inequity," (3) "whether upholding the rule is likely to result in serious detriment prejudicial to public interests," and (4) "whether the prior decision was an abrupt and largely unexplained departure from precedent."[45]

In addition, it is appropriate to ask "whether changes in the law or facts no longer justify the decision."[46]

---

[41] *Id.* at 463, quoting *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998).

[42] *Coldwater v Consumers Energy Co*, 500 Mich 158, 172; 895 NW2d 154 (2017) (quotation marks and citation omitted).

[43] *Robinson*, 462 Mich at 463.

[44] *Id.* at 464 (quotation marks and citations omitted).

[45] *McCormick v Carrier*, 487 Mich 180, 211; 795 NW2d 517 (2010) (opinion by M. F. CAVANAGH, J.) (citation omitted).

[46] *Coldwater*, 500 Mich at 173, citing *Robinson*, 462 Mich at 464.

The majority opinion concludes that the above-mentioned stare decisis factors weigh in favor of overruling *Carpenter*. First, the majority opinion for all intents and purposes ignores whether *Carpenter* defies practical workability. Ironically, the majority opinion concludes that *Carpenter* is "straightforward to apply." At the same time, the majority opinion observes "this factor to be of little weight in comparison to the import of safeguarding the ability of criminal defendants to present a defense . . . ." This is error. Our caselaw does not authorize a reviewing court to decide that certain factors are "of little weight" or constitute "poor reason[s]" for retaining a previous decision by simply emphasizing the high stakes in the case.[47] Moreover, I fail to accept the majority opinion's assertion that it is this Court's duty to "safeguard[]" defenses that "should" be available to defendants. Whether defendants *must* be able to assert the diminished-capacity defense has been clearly established: The United States Supreme Court has repeatedly held that criminal defendants do not have a due-process right to present a diminished-capacity defense.[48] Whether defendants *ought* to be able to assert the diminished-capacity defense is a question for the Legislature. The view that *Carpenter* "should" have allowed the

---

[47] The majority opinion responds by asserting that the "practical workability" factor involves an analysis of "the goal the decision is working toward." The majority opinion concludes that the goal in criminal trials is "the full protection of a criminal defendant's legal rights" and implies that *Carpenter* undermines that goal. This broadening of the "practical workability" factor renders it a dead letter. I cannot imagine a case in which a reviewing court would be unable to manipulate such a soft definition in favor of overruling whatever precedent may be at issue.

[48] *Fisher v United States*, 328 US 463, 476; 66 S Ct 1318; 90 L Ed 1382 (1946); *Clark v Arizona*, 548 US 735, 769-779; 126 S Ct 2709; 165 L Ed 2d 842 (2006).

17

diminished-capacity defense goes to whether *Carpenter* was rightly or wrongly decided and does not justify rejection of the core principles of stare decisis.

The majority opinion next concludes that reliance interests do not justify retaining *Carpenter*. But the majority opinion offers little reasoning to support this conclusion. In my view, today's decision reshapes strategy incentives for criminal defendants and creates significant procedural and evidentiary questions. I am not confident that past practices and current evidentiary rules suffice to untangle the knot of pre-*Carpenter* caselaw or to resolve the procedural uncertainty this Court imposes on litigants by overruling *Carpenter*.

Next, the majority opinion criticizes the *Carpenter* Court for overlooking "already recognized" facts when it handed down the *Carpenter* decision. The majority opinion also notes that the *Carpenter* decision "has increasingly appeared inconsistent with the state of the medical and psychiatric fields as the scientific understanding of mental health and intellectual disability has evolved." The majority opinion concludes that *Carpenter* "renders our approach to mental-health-based defenses out of step with the scientific community and, arguably, other corners of our own state justice system."

The majority opinion fails to properly analyze this factor of the stare decisis inquiry. The attack on *Carpenter*'s reasonableness in light of unchanged facts is irrelevant to a proper stare decisis analysis and more properly constitutes a merits-based argument against *Carpenter*. Additionally, the claim that *Carpenter* is out of line with modern scientific understanding improperly characterizes the scientific consensus as a relevant "fact" in the evaluation of *Carpenter* and its continued viability under principles of stare decisis. The issue in both *Carpenter* and this case is one of statutory interpretation, not policy or scientific recommendations. The *Carpenter* Court recognized this when it declined to "join

18

the affray" of legal and scientific policy debates, instead concluding that "our Legislature, by enacting the comprehensive statutory framework described above, has already conclusively determined when mental incapacity can serve as a basis for relieving one from criminal responsibility."[49]  In short, the majority opinion's policy arguments are irrelevant to the question of whether any change in the law or facts justifies overruling *Carpenter*. The underlying statute has not changed since the *Carpenter* decision, so this factor weighs in favor of retaining *Carpenter*.

Inexplicably, the majority opinion only analyzes the third and fourth stare decisis factors in passing.  The third factor asks "whether upholding the rule is likely to result in serious detriment prejudicial to public interests."[50]  Given that criminal defendants do not have a constitutional right to present diminished-capacity evidence to negate the element of *mens rea*, there is no public interest at stake.  Rather, *Carpenter* represents a good-faith interpretation of the statutory text.  Any disagreement with the statute is not a detriment prejudicial to public interests but is more properly directed toward the Legislature as a policy argument.  Accordingly, I conclude that the third factor weighs in favor of retaining *Carpenter*.

The fourth factor asks "whether the prior decision was an abrupt and largely unexplained departure from precedent."[51]  In light of the United States Supreme Court's holding that *Carpenter* was "based on the [Michigan] supreme court's reasonable

---

[49] *Carpenter*, 464 Mich at 237.

[50] *McCormick*, 487 Mich at 211 (opinion by M. F. CAVANAGH, J.) (quotation marks and citation omitted).

[51] *Id*. (quotation marks and citation omitted).

19

interpretation of the language of a controlling statute,"[52] I cannot conclude that *Carpenter* was a departure from precedent. While it is true that *Carpenter* reversed Court of Appeals precedent, the case represented this Court's first interpretation of MCL 768.21a and did not overrule any precedent of this Court. A previous case's correction of lower-court precedent does not qualify as a basis for overruling that case in spite of stare decisis principles. The fourth factor weighs in favor of retaining *Carpenter*.

The majority opinion's stare decisis analysis amounts to nothing more than an assertion that reliance interests are minimal while science has changed since *Carpenter*. The majority opinion downplays and even ignores the other stare decisis factors. I would conclude on the basis of the stare decisis factors engrained in our caselaw that *Carpenter* should be retained, regardless of whether it is correct on the merits.

D. CONSEQUENTIAL CONSIDERATIONS

Not only does the majority opinion trivialize and misapply principles of statutory construction and rely on weak sources of support, but it also fails to address the many consequences of today's decision—consequences that highlight the fact that Michigan's Legislature never anticipated this outcome. First, lest the majority think that today's decision will have no impact on the number of mentally ill defendants committed for psychiatric treatment because so few defendants will choose to argue diminished capacity instead of legal insanity, consider the fact that defendants have every incentive to argue diminished capacity. Along these lines, the *Carpenter* majority rightly noted that " '[i]f . . . psychiatric testimony were generally admissible to cast a reasonable doubt upon

---

[52] *Metrish*, 569 US at 368.

20

whatever degree of mens rea was necessary for the charged offense, thus resulting in outright acquittal, there would be scant reason indeed for a defendant to risk such confinement by arguing the greater form of mental deficiency.' "[53]   In light of these conclusions, the *Carpenter* Court rightly determined that allowing a diminished-capacity defense would " 'swallow up the insanity defense and its attendant commitment provisions.' "[54]   The *Carpenter* majority correctly declined to adopt an interpretation that would "defeat the point of other provisions."[55]

The majority opinion's holding also raises several questions that it leaves entirely unanswered.  For example, are defendants required to adhere to the notice and evidentiary requirements of the legal-insanity defense?[56]   In holding that the diminished-capacity defense comes within the statutory definition of legal insanity, the *Mangiapane* Court held that the defendant was required to comply with all the notice requirements of MCL 768.20a, specifically that the defendant must provide notice at least 30 days prior to trial if he intends to assert the diminished-capacity defense and must sit for a psychiatric examination as ordered by the court.[57]   Now that diminished capacity is again available to

---

[53] *Carpenter*, 464 Mich at 238-239, quoting *Bethea v United States*, 365 A2d 64, 90-91 (DC, 1976).

[54] *Carpenter*, 464 Mich at 239, quoting *State v Wilcox*, 70 Ohio St 2d 182, 189; 436 NE2d 523 (1982).

[55] *Statutory Structure*, 132 Yale L J at 1535.

[56] In her concurrence, Chief Justice CAVANAGH recognizes this issue and proposes that a new or modified court rule can fill the gap.  Although she deserves credit for flagging an issue that the majority opinion ignores, her suggestion only reinforces my conclusion that the majority opinion is legislating, not interpreting the existing law.

[57] *Mangiapane*, 85 Mich App at 395 ("In short, we hold that if defendant chooses to avail himself of the defense that he here asserts, namely, that he lacks mental capacity to

21

defendants as a standalone defense, do these requirements continue to apply? If not, then what standards do apply?

Finally, do defendants bear the burden of proof for the diminished-capacity defense, as is the case for legal insanity?[58] The *Denton* Court held that "[o]nce the defendant presents evidence of diminished capacity, the prosecutor must counter such evidence, and the extent to which the prosecutor must do so is dependent upon the nature and amount of the evidence furnished by the defendant."[59] This was the same standard applicable to the legal-insanity defense. In 1994, after *Denton*, the Michigan Legislature amended MCL 768.21a to add a new burden of proof for legal insanity: "The defendant has the burden of proving the defense of insanity by a preponderance of the evidence."[60] *Denton* extended *Mangiapane* to incorporate the burden-of-proof requirements from legal insanity to the defense of diminished capacity. The diminished-capacity defense has been prohibited for the last 25 years, and in the meantime, the Legislature changed the applicable burden of proof.[61] Now that the diminished-capacity defense is viable, we know that the explicit holding of *Denton* is no longer good law. But that leaves the question: Is the principle of *Denton* still in force? That is to say, is it still true that we look to the burden-of-proof

---

entertain the specific intent required as an element of the crime with which he is charged whether it be called the defense of diminished capacity or not, then full compliance must be had with §§ 20a, 29a and 36.").

[58] MCL 768.21a(3).

[59] *Denton*, 138 Mich App at 572.

[60] MCL 768.21a(3), as amended by 1994 PA 56.

[61] 1994 PA 56.

requirement from the legal-insanity statute to determine the burden of proof for diminished capacity? The majority opinion leaves this significant question unanswered.

### III. CONCLUSION

A close and careful reading of the relevant statutory provisions leaves me with a definite and firm conclusion that the *Carpenter* Court rightly held that Michigan law prohibits the use of the diminished-capacity defense. Specifically, permitting the diminished-capacity defense allows intellectually disabled defendants to circumvent the Legislature's policy choice that intellectually disabled criminals receive some form of state-enforced psychiatric attention. Today's majority opinion undermines the expressed will of the Legislature, renders multiple provisions of the statute inconsistent with its judicially created diminished-capacity defense, and raises new and thorny questions that courts and litigants will have to face as a result. In contrast, I would hold that Michigan statute bars the assertion of a diminished-capacity defense. It is for the Legislature to decide as a matter of policy whether the diminished-capacity defense should be permitted under Michigan law. I respectfully dissent, and I would affirm the trial court.

Brian K. Zahra